## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | ) **Criminal Case No. 25-125 (RJL)** |
| | ) |
| **ANTOINE GATLING,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## MEMORANDUM OPINION
September ⟨2⟩ , 2025 [Dkt. #24]

Defendant Antoine Gatling is charged with one count of unlawful possession of a firearm and ammunition by a person convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1). Indictment [Dkt. #1]. These charges stem from a handgun police officers found in Gatling's satchel when they stopped him to investigate a report of an attempted burglary. *See* Gov't's Mem. in Supp. of Pretrial Detention [Dkt. #7] at 2–5. Gatling believes that the stop and the search of his satchel violated the Fourth Amendment and has moved to suppress the handgun obtained as a result of the search. *See generally* Def.'s Mot. to Suppress Physical Evidence ("Def.'s Mot.") [Dkt. #12]. Having considered the parties' briefing, the oral argument and officer testimony presented at the evidentiary hearing, and the entire record in this case, I will **DENY** Gatling's motion to suppress.

## I.    BACKGROUND

On the morning of March 1, 2024, an individual called 9-1-1 to report that a man was attempting to break into an apartment in Southeast Washington, D.C. *See* Audio

1

Recording of 9-1-1 Call, Gov't's Suppression Ex. 1 ("9-1-1 Call") at 00:01–00:36.  The tipster stated that he had seen the residents of the apartment leave for work, and that the suspect kept going back and forth into the building and was trying to open a window into the apartment.  *Id.* at 00:45–01:00, 01:26–01:33.  The tipster described the suspect as an African American male wearing a black jacket, black pants, and black-and-white shoes, and carrying a black bag.  *Id.* at 01:15–02:07.  He also said the suspect had a "handgun," and he saw the suspect put the "gun in his pants."  *Id.* at 01:20–01:27, 03:10–03:18.  At the end of the call, the tipster—who declined to provide his name—confirmed that he could still see the suspect in the first floor hallway of the apartment building.  *Id.* at 02:31–02:40, 03:24–03:42.

A radio dispatcher put out a call to police officers about the attempted break-in, relaying to officers the suspect's location, activity, and description, as provided by the tipster.  Audio Recording of 9-1-1 Dispatcher, Gov't's Suppression Ex. 2 ("Radio Call") 02:25–03:43.  The dispatcher also sent a copy of the 9-1-1 call notes to the officers.  *See* Event Chronology by Dispatcher, Gov't's Suppression Ex. 3 ("Dispatcher Slip").  The dispatcher warned officers that the suspect was armed.  Radio Call at 03:30–03:36.  Metropolitan Police Department ("MPD") Officer Nesseem Mekhael responded and said he was nearby.  Tr. of July 23, 2025 Hearing ("Hearing Tr.") [Dkt. #22] at 19:21–24.[1]

Officer Mekhael arrived on scene a few minutes later and saw Gatling near an entrance to the apartment building.  Hearing Tr. at 22:24–25; Video Recording of Officer

---

[1] Officer Mekhael testified during the July 23, 2025 hearing on defendant's motion to suppress.  The Court finds Officer Mekhael's testimony credible.

2

Mekhael's Body Worn Camera, Gov't's Suppression Ex. 4 ("Mekhael BWC") at 09:11:30.
Gatling was standing next to an open door on a small elevated front stoop that was partially
enclosed by a roughly waist-high railing. Mekhael BWC at 09:11:48. Like the individual
described by the 9-1-1 caller, Gatling was wearing a black jacket, black pants, and black-
and-white shoes, and he had a black satchel slung over his shoulder and resting on his back.
Hearing Tr. at 27:4—28:3; Mekhael BWC at 09:11:46–09:12:01. Officer Mekhael
approached Gatling, who was standing in the doorframe of the apartment building with the
door propped open by a black bag. As Officer Mekhael approached, Gatling moved a few
feet inside, and Officer Mekhael followed him. Mekhael BWC at 09:11:55–09:12:14.

Officer Mekhael caught up with Gatling, who was standing just inside the doorway
to the apartment building in an interior stairwell. When Officer Mekhael stated that he had
received a call that someone was trying to break in, Gatling responded that he was
"[v]isiting his brother." Hearing Tr. at 28:17–19; Mekhael BWC at 09:12:00–09:12:09.
Officer Mekhael then asked Gatling to step outside. Gatling complied and stepped out the
door and back onto the exterior stoop. Mekhael BWC at 09:12:12–09:12:15. Officer
Mekhael then told Gatling that he was going to "pat [him] down for safety." Mekhael
BWC at 09:12:10–09:12:25; Hearing Tr. at 28:23–29:3.

Officer Mekhael started patting down Gatling's waistline, but he did not feel a
weapon. Mekhael BWC at 09:12:20–09:12:23. As Officer Mekhael reached behind
Gatling to pat down the satchel resting on Gatling's back, Gatling immediately resisted,
twisting his body away from Officer Mekhael and putting his hands out to block Officer
Mekhael from continuing the pat down. Mekhael BWC at 09:12:24–09:12:30. Officer

3

Mekhael testified that Gatling "tilted his body and . . . showed some signs of resisting[,] preventing [Officer Mekhael] from going around the back." Hearing Tr. at 29:14–24.

A pedestrian walked by, and Gatling asked if he had seen him breaking into an apartment. The pedestrian did not engage with Gatling and told Officer Mekhael that he did not know Gatling. Def.'s Mot. at 2; Hearing Tr. at 30:4–8; Mekhael BWC at 09:12:40–09:13:00. Officer Mekhael then told Gatling that he would be stopped for further investigation and tried unsuccessfully to handcuff him. When Gatling continued to resist, Officer Mekhael told him that if he did not want to be placed in handcuffs, he should let Officer Mekhael conduct the pat down. Hearing Tr. at 30:9–14; Mekhael BWC at 09:13:00–09:13:25. By this point, other MPD officers had arrived and approached to assist Officer Mekhael. Hearing Tr. at 32:21–25; Mekhael BWC at 09:13:25–09:13:57. As they approached, Officer Mekhael again tried to handcuff Gatling, and the other officers joined in to assist in restraining him. Mekhael BWC at 09:13:25–09:13:57. Because Gatling was "actively resisting" and "twisting his body left and right," it took the officers "a minute to actually secure him in handcuffs." Hearing Tr. at 32:22–25.

Once Gatling was handcuffed, and while the other officers were still working to restrain him, Officer Mekhael removed the satchel from Gatling's back. Hearing Tr. at 34:2–7; Mekhael BWC at 09:13:58–09:14:05. Still carrying the satchel, Officer Mekhael then walked a few feet away into the locked stairwell of the apartment building to check for contraband or weapons that Gatling may have left behind when Officer Mekhael originally approached him. Hearing Tr. at 34:24–35:14; Mekhael BWC at 09:14:05–

4

09:14:25.[2] While inside the stairwell and looking briefly for any items Gatling may have left behind, Officer Mekhael patted down the satchel's exterior and felt a hard object consistent with a handgun. Hearing Tr. at 35:17–23; Mekhael BWC at 09:14:25–09:14:35. All in all, roughly 30 seconds elapsed between Officer Mekhael's removal of the satchel from Gatling's person and the pat down. *See* Mekhael BWC at 09:13:59–09:14:27.

Officer Mekhael then opened the bag and uncovered a gun. Hearing Tr. at 36:5–17; Mekhael BWC at 09:14:30–09:15:45. At this time, Gatling was still outside of the apartment building, in handcuffs and being "held by the other officers." Hearing Tr. at 36:18–24; Mekhael BWC at 09:14:25–09:15:45. Officer Mekhael informed the other officers about the firearm, who had also found a live round of ammunition and a magazine on Gatling's person. Hearing Tr. at 37:2–5; Gov't Mem. in Opp'n to Def.'s Mot ("Gov't Opp'n") [Dkt. #14] at 6. Gatling was taken to the stationhouse for processing. Gov't Opp'n at 6.

On April 30, 2025, the Government filed an Indictment charging Gatling with one count of unlawful possession of a firearm by a convicted felon. *See* Indictment. Magistrate Judge Michael Harvey arraigned Gatling and ordered him detained pending trial. *See* Min. Order (May 6, 2025); Order of Detention Pending Trial [Dkt. #11]. On June 3, Gatling filed his motion to suppress. Def.'s Mot. The Government opposed the motion, and once the motion was fully briefed the Court held a suppression hearing on July 23. Gov't's Opp'n; Def.'s Reply Regarding his Mot. to Suppress ("Def.'s Reply") [Dkt. #15]; Gov't's

---

[2] The same pedestrian Gatling had called out to a couple minutes earlier was standing inside the stairwell and opened the door for Officer Mekhael. Mekhael BWC at 09:14:19–09:14:23.

Suppl. Mem. in Opp'n to Def.'s Mot. ("Gov't's Suppl. Mem.") [Dkt. #17]; Min. Entry for Evid. Hearing (July 23, 2025).

During the suppression hearing, the Court heard testimony from Officer Mekhael, which the Court found credible. *See* Min. Entry for Evid. Hearing (July 23, 2025). The parties' arguments raised novel and important issues, and as such the Court permitted the parties to submit supplemental briefing within one week of receiving the hearing transcript. Hearing Tr. at 67:14–68:4. The Court received supplemental briefs from the Government on August 8, Gov't's Second Suppl. Mem. in Opp'n to Def.'s Mot. ("Gov't's Second Suppl. Mem.") [Dkt. #21], and from the defense on August 17, Def.'s Suppl. Br. in Support of Def.'s Mot. ("Def.'s Suppl. Br.") [Dkt. #23]. The motion is now fully ripe for review.

## II.    ANALYSIS

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "When the government conducts an unconstitutional search or seizure, the Court must exclude any evidence obtained as the 'fruit' of that search or seizure." *United States v. Sheffield*, 799 F. Supp. 2d 22, 28 (D.D.C. 2011) (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)).

Gatling asserts that his seizure and the search of his satchel violated the Fourth Amendment and that the evidence obtained as a result of those actions should be suppressed. He makes three arguments: (1) his initial *Terry* stop transformed into an arrest, for which the officers lacked probable cause; (2) regardless of whether his detention was an investigative stop or an arrest, the officers lacked the requisite justification; and (3) the

search of his satchel was unreasonable, as he was physically separated from the satchel and could no longer access it. *See* Def.'s Mot. at 3. The Government responds that reasonable suspicion supported the *Terry* stop, which did not transform into an arrest, and that the pat down of the satchel was within the scope of a *Terry* frisk. *See generally* Gov't's Opp'n; Gov't's Suppl. Mem.; Gov't's Second Suppl. Mem. Addressing each of defendant's arguments in turn, I find that neither the stop nor the search violated the Fourth Amendment and will therefore **DENY** the motion to suppress.

A.    Nature of the Stop

The parties agree that Officer Mekhael's encounter with Gatling began as a *Terry* stop. They diverge, however, on whether the stop remained a temporary investigative detention or transformed into an arrest as it progressed. Gatling argues that once he was surrounded by multiple officers, pinned against a metal fence, and handcuffed, he was under arrest. Def.'s Mot. at 5; Def.'s Supp. Br. at 8–9. The Government maintains that the encounter remained a *Terry* stop through the search of Gatling's satchel. Gov't's Opp'n at 8–10.

To investigate a person reasonably suspected of criminal activity, an officer "may briefly stop the suspicious person and make 'reasonable inquiries' aimed at confirming or dispelling his suspicions." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). "Although an investigative stop is not an arrest, it may become one if the duration of the stop or the amount of force used is 'unreasonable' under the circumstances." *United States v. Laing*, 889 F.2d 281, 285 (D.C. Cir. 1989) (citation omitted). "The point at which an investigative stop becomes an arrest is not

7

marked with a bright line." *United States v. Devaugh*, 422 F. Supp. 3d 104, 114 (D.D.C. 2019) (quoting *Hall v. District of Columbia*, 867 F.3d 138, 153 (D.C. Cir. 2017)). Rather, the "scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case." *Florida v. Royer*, 460 U.S. 491, 500 (1983). Courts consider objective and subjective factors, including "the officer's intent in stopping the citizen; the impression conveyed to the citizen as to whether he was in custody or only briefly detained for questioning; the length of the stop; the questions, if any, asked; and the extent of the search, if any, made." *See United States v. White*, 648 F.2d 29, 34 (D.C. Cir. 1981).

The *Terry* stop at issue here did not become an arrest until after Officer Mekhael found the handgun in Gatling's satchel. Fewer than five minutes elapsed between Gatling's first interaction with Officer Mekhael and the search of the satchel. *See* Mekhael BWC at 09:11:40–09:16:00. *Cf. United States v. Hutchinson*, 408 F.3d 796, 801–02 (D.C. Cir. 2005) (prolonging *Terry* stop two to five minutes to run records check did not violate Fourth Amendment). The stop lasted this long in part because Gatling "refus[ed] to comply with . . . the pat down" and "actively resisted handcuffs" by "twisting his body." *See* Hearing Tr. at 30:5–6, 32:21–25 (Officer Mekhael: "[I]t took a minute to actually secure him in handcuffs."). Officer Mekhael also told Gatling he was being stopped for investigation, not that he was being arrested, and he did not ask probing questions about Gatling's conduct. Mekhael BWC at 09:13:00–09:13:25. These facts all suggest that during the relevant time period, the stop remained a stop. *See White*, 648 F.3d at 34.

Gatling maintains that by pinning him against the small fence surrounding the stoop and using handcuffs, the officers transformed the *Terry* stop into an arrest. Def.'s Mot.

8

at 5. Not so. The right to make an investigatory stop "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *United States v. Dykes*, 406 F.3d 717, 720 (D.C. Cir. 2005) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The "amount of force used ... must be reasonable, but may include using handcuffs or forcing the detainee to lie down to prevent flight." *Laing*, 889 F.2d at 285. Our Circuit has held that a far greater degree of force—tackling and handcuffing a fleeing suspect—did not necessarily transform a stop into an arrest where officers had reasonable suspicion to believe that the suspect was armed and the suspect was "resisting both the officers' commands and their physical efforts" to frisk him. *Dykes*, 406 F.3d at 720. Thus, the question is not whether force was used at all, but whether the degree of force used was reasonably necessary to "neutralize the threat of physical harm." *Terry*, 392 U.S. at 24.

Here, the use of handcuffs and limited force to restrain Gatling was reasonably necessary to carry out the stop and neutralize any threat of harm. The officers *had been told* that Gatling was armed, Gatling resisted Officer Mekhael's pat down, and Gatling continued to jostle with officers even after he was handcuffed. *See Laing*, 889 F.2d at 286 (relevant factors include "an informant's tips that persons might be armed," "furtive hand movements," and "flight or attempted flight by the [suspect]"). Indeed, Gatling's resistance impeded Officer Mekhael's efforts to search Gatling's satchel, an opportune place to hide a gun. Accordingly, the officers were justified in taking "necessary steps" to restrain Gatling and secure the scene so they could safely investigate. *Dykes*, 406 F.3d at 720. As such, their reasonable actions did not convert the *Terry* stop into an arrest.

B.    Justification for the Stop

Having found that Gatling's detention here is properly characterized as a *Terry* stop, the next question is whether the officers had the requisite justification for a *Terry* stop. I conclude that they did.

"[O]fficers may conduct a brief investigative '*Terry* stop' so long as they have 'reasonable, articulable suspicion' of criminal conduct." *United States v. Goddard*, 491 F.3d 457, 460 (D.C. Cir. 2007) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). This standard requires "only that officers have a 'minimal level of objective justification,'—a standard significantly lower than the probable cause required for a warrant." *Id.* (internal citation omitted). "The 'reasonable suspicion' necessary to justify [a *Terry* stop] 'is dependent upon both the content of information possessed by police and its degree of reliability.'" *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)).

Recall that the basis for Officer Mekhael's stop and subsequent investigation of Gatling was an anonymous tip received from a 9-1-1 caller. The caller reported that an African American male wearing a black jacket, black pants, and black-and-white shoes and carrying a black bag was attempting to break into an apartment. 9-1-1 Call at 01:15–02:07. The caller also stated the suspect had a handgun that he put in his pants. *Id.* at 01:20–01:27, 03:10–03:18. Officer Mekhael arrived on the scene minutes later to find Gatling in the exact location and wearing the exact clothing described by the caller. Gov't's Opp'n at 10–11. Gatling argues that the 9-1-1 call was not enough to provide reasonable suspicion for a *Terry* stop because the call was merely a "non-predictive anonymous tip"—*i.e.*, it

10

corroborated only Gatling's presence and his appearance, but it did not predict his future behavior.  Def.'s Reply at 1–2; Def.'s Mot. at 5.

Anonymous tips can, but do not always, establish reasonable suspicion justifying a *Terry* stop.  *See Navarette*, 572 U.S. at 397 ("[U]nder appropriate circumstances, an anonymous tip can demonstrate 'sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop.'" (citation omitted)).  The analysis of the reliability of anonymous tips is highly case- and fact-specific, but two Supreme Court cases—which the parties rely on almost exclusively—provide helpful guideposts.

In *Florida v. J.L.*, police received word from an anonymous caller that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." 529 U.S. 266, 268 (2000).  Police arrived at the bus stop six minutes later and "saw three black males," one of whom "was wearing a plaid shirt."  *Id.*  "Apart from the tip, the officers had no reason to suspect any of the three of illegal conduct," and none of the individuals made "threatening or otherwise unusual movements."  *Id.*  Nonetheless, officers stopped the man in the plaid shirt, frisked him, and seized a gun from his pocket. The Supreme Court found that the officers lacked reasonable suspicion to stop and frisk the man because the anonymous tip lacked sufficient "indicia of reliability."  *See id.* at 271. Specifically, the tipster "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility."  *Id.*  "All the police had to go on . . . was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L."  *Id.*  And providing an accurate description of the suspect's clothing

11

and location is not enough to establish reliability, as a tip must "be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.*

*Navarette*, on the other hand, shows when a tip *can* be sufficiently reliable to justify a *Terry* stop. In *Navarette*, an individual called 9-1-1 to report that a vehicle had tried to run her off the road. 572 U.S. at 395. The tipster reported the color, make, model, and license plate number of the car, which matched a car pulled over by police. *Id.* at 398–99. The tip was made contemporaneous to the incident, and the tipster had "eyewitness knowledge of the alleged dangerous driving." *Id.* The tipster's use of the 9-1-1 emergency system also supported the tip's veracity, as the system records calls, tracks phone numbers, and provides mechanisms for punishing false reports. *Id.* at 400–01. Thus, while 9-1-1 calls are not *per se* reliable, "a reasonable officer could conclude that a false tipster would think twice before using such a system." *Id.* at 401. The Supreme Court therefore found that, under the totality of the circumstances, the tip was sufficiently reliable to provide reasonable suspicion of criminal activity. *See id.* at 404.

The question before me is whether the instant case is closer to *J.L.* or *Navarette*. I find that the anonymous 9-1-1 call here is more reliable than the "bare-bones tip" in *J.L.*, *see Navarette*, 572 U.S. at 398, and instead more closely resembles the tip in *Navarette*.

At the outset, and as in *Navarette*, the tipster used the 9-1-1 system to provide a contemporaneous account of the alleged wrongdoing. In making the initial report, the tipster spoke with 9-1-1 for almost four minutes and provided a contemporaneous, eyewitness report of the suspect's description and actions, along with what he believed to be the criminal activity afoot. At the end of the call, he specifically stated that he could

12

still see the suspect in the building. 9-1-1 Call at 03:25–03:38. He also twice stated that the suspect was armed, based on his own observation of a handgun. *Id.* at 01:20–01:27, 03:10–03:18. Such a "first-hand" account with an "explicit and detailed description of alleged wrongdoing" entitles a tip to "greater weight than might otherwise be the case." *Illinois v. Gates*, 462 U.S. 213, 234 (1983). In *J.L.*, by contrast, the tipster provided a "bare report" with few details regarding the alleged criminality and never "explained how he knew about the gun." 529 U.S. at 271.

After receiving the 9-1-1 tip, the information was relayed directly to Officer Mekhael. *See* Hearing Tr. at 15:13–17:25; Dispatcher Slip. The details of the tip remained consistent as it was passed from the 9-1-1 operator to the radio dispatcher to Officer Mekhael, and "it is perfectly reasonable for officers to rely on the information furnished to them by a dispatcher in the ordinary course . . . ." *Goolsby v. District of Columbia*, 317 F. Supp. 3d 582, 592 (D.D.C. 2018). Further, when Officer Mekhael arrived on scene minutes later, he spotted an individual exactly matching the suspect's gender, race, and clothing. *See* Hearing Tr. at 28:1–3; Mekhael BWC at 09:12:01. While this alone may not create reasonable suspicion under *J.L.*, *see* 529 U.S. at 271, the tipster also correctly predicted that Gatling would be pacing back and forth around the stairwell of the apartment building, *see* 9-1-1 Call at 01:26–01:33; Dispatcher Slip at 2; Mekhael BWC at 09:11:47–09:11:56. "By accurately predicting future behavior," the tipster's information is appropriately deemed reliable. *See Navarette*, 572 U.S. at 398; *see also White*, 496 U.S. at 331–32 ("[B]ecause an informant is shown to be right about some things, he is probably right about

other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity.").

Finally, after the interaction with Gatling, Officer Mekhael contacted the original tipster at the number traced to his call to update him on the interaction and ask if he would provide a statement to investigators. (He declined.) Hearing Tr. at 10:23–25, 14:3–12. Nonetheless, the ability to "identify[] and trac[e] callers" provides additional credibility to tips acquired through the 9-1-1 system. *Navarette*, 572 U.S. at 400.

Based on the totality of the circumstances, I find that the anonymous 9-1-1 call "bore adequate indicia of reliability for [Officer Mekhael] to credit the caller's account." *Id.* at 398. Officer Mekhael was justified in proceeding under the assumption that defendant was attempting a burglary and was armed, and he had the necessary reasonable suspicion to conduct a *Terry* stop.[3]

C.    Search of the Satchel

The final (and most difficult) question is whether Officer Mekhael's pat down and search of Gatling's satchel violated the Fourth Amendment. Gatling claims that the pat down was improper because it occurred when he was handcuffed, pinned against a fence, surrounded by officers, and separated from the satchel by several feet and a locked door. According to Gatling, he no longer had any ability to access the satchel and, as such, the pat down was not justified under *Terry*. *See* Def.'s Mot. at 8–10; Def.'s Reply at 5; Def.'s

---

[3] This reasonable suspicion was not dispelled by Gatling's statement that he was visiting his brother. *See* Mekhael BWC at 09:12:00–09:12:16. For one thing, the statement was unsupported by any corroborating details. And further, "reasonable suspicion 'need not rule out the possibility of innocent conduct'" to support an investigatory stop. *Navarette*, 572 U.S. at 403 (citation omitted).

Supp. Br. at 11–15.[4]  The Government, for its part, argues that the temporary nature of a *Terry* stop justified the pat down even after the satchel had been removed from Gatling's person, as Officer Mekhael reasonably believed the satchel contained a gun and, absent a pat down, the satchel would have been returned to Gatling. Gov't's Opp. at 12–17; Gov't's Suppl. Mem. at 3.[5]

Where an officer stops an individual reasonably suspected to be "armed and presently dangerous," the officer may "conduct a patdown search 'to determine whether the person is in fact carrying a weapon.'" *Dickerson*, 508 U.S. at 373 (quoting *Terry*, 392 U.S. at 24). The purpose of a *Terry* frisk is "not to discover evidence of crime, but to 'allow the officer to pursue his investigation without fear of violence.'" *Id.* (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972)). As such, the scope of such a protective search "must be strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.'" *Id.* (quoting *Terry*, 392 U.S. at 26).

A suspect's personal effects—like the satchel Gatling was carrying—are generally within the scope of a *Terry* frisk. *See United States v. Williams*, 669 F. Supp. 3d 8, 27 (D.D.C. 2023) ("[A]n officer may as part of a *Terry* stop frisk a bag or backpack . . . .");

---

[4] Gatling also argues that the search of the satchel could not be justified as a search incident to arrest, pointing to Officer Mekhael's own testimony characterizing aspects of the search as such. *See* Def.'s Supp. Br. at 9–11 (quoting Hearing Tr. at 37). I need not reach this argument because I find that Officer Mekhael's stop and frisk of Gatling was separately justified under *Terry*. *See supra* Section II.A. Further, Officer Mekhael's own post-hoc characterization of the search is not relevant to my analysis of the objective reasonableness of his actions. *See Maryland v. Macon*, 472 U.S. 463, 470–71 (1985).

[5] The Government has made clear that it is not arguing that Officer Mekhael was conducting a search incident to arrest. *See* Hearing Tr. at 49:17–22 ("[O]ur sole position is that the frisk of the satchel was permitted under *Terry*.").

*United States v. Hernandez-Mendez*, 626 F.3d 203, 213 (4th Cir. 2010) ("It should be noted that the distinction between a pat down of [defendant's] clothing and a pat down of her purse is not meaningful in this particular context."). And if, during a permissible frisk, the officer "feels an object whose contour or mass makes its identity immediately apparent" as a weapon, the officer may seize it. *See Dickerson*, 508 U.S. at 375–76.

At the outset, I find that Officer Mekhael was justified in believing that Gatling was armed and dangerous. First off, the 9-1-1 caller said the suspect had a "handgun" that he put "in his pants," *see* 9-1-1 Call at 01:20–01:27, 03:10–03:18, and the radio dispatcher conveyed the warning to Officer Mekhael that the suspect had a "gun on his pants," *see* Radio Call at 03:30–03:37; Hearing Tr. at 28:25–29:3. As I have already found, the original source of this information was reliable, and Officer Mekhael's reliance on this information was reasonable. *See supra* Section II.B. In addition, Officer Mekhael's interactions with Gatling further suggested he might be armed. When Officer Mekhael began patting down Gatling's waistline—which, as the Officer testified, is a "[c]ommon area to conceal a weapon"—he did not find a handgun. *See* Hearing Tr. at 29:4–8; Mekhael BWC at 09:12:20–09:12:26. But when Officer Mekhael attempted to pat down Gatling's back and satchel—another common area for stowing a firearm, *see* Hearing Tr. at 8:10–21—Gatling resisted, "tilt[ing] his body" and pushing Officer Mekhael away. Hearing Tr. at 29:14–24; Mekhael BWC at 09:12:24–09:12:32. Gatling's immediate resistance when Officer Mekhael reached for the satchel raised reasonable suspicion that the handgun referenced by the radio dispatcher was in the satchel. *See United States v. Williams*, 962 F.2d 1218, 1224 (6th Cir. 1992) ("Defendant's vehement refusal to allow [the officer] to

16

touch the purse also raised legitimate suspicion of its potentially dangerous contents." (citation omitted)).

Thus, given the circumstances leading up to Officer Mekhael's decision to handcuff Gatling, Officer Mekhael was at least justified in attempting to frisk the satchel *while it was still on Gatling's person*. The more nuanced question is whether Officer Mekhael was justified in frisking the satchel *after it was removed from Gatling's body and taken into the locked stairwell*, all while Gatling was handcuffed and restrained by officers.

Gatling argues that even if Officer Mekhael had reasonable suspicion to pat down the satchel while it was on his person, Officer Mekhael's decision to handcuff Gatling, remove the satchel, and take it outside Gatling's immediate reach and behind a locked door brought the satchel outside the scope of *Terry*. At bottom, Gatling contends that because he was physically restrained and could not access the satchel at the time of the frisk, the frisk was unreasonable. Def.'s Reply at 5. Indeed, Officer Mekhael acknowledged that, at that time he frisked the satchel, Gatling "could not have accessed the bag" and Officer Mekhael "did not believe that [Gatling] was a threat to [his] safety." Hearing Tr. at 39:21–40:4. Thus, per Gatling, the pat down of the satchel was not permitted under *Terry*.

The Government maintains that even if Gatling did not have access to the satchel *at the moment it was frisked*, the frisk was still reasonable. By virtue of the temporary nature of a *Terry* stop, the Government argues that Gatling "stood every chan[c]e of having his satchel returned to him at the conclusion of the stop." Gov't's Suppl. Mem. at 4. Thus, it was reasonable to pat down the satchel before potentially returning it to Gatling, regardless of whether the satchel was within Gatling's grab area at the time it was patted down.

17

These facts present a close call—but ultimately, I agree with the Government. The scope of a *Terry* frisk must be limited to what is "necessary for the discovery of weapons which might be used to harm the officer or others nearby." *Terry*, 392 U.S. at 26. Applying that principle to the facts presented here, Officer Mekhael acted reasonably in patting down Gatling's satchel for a weapon, even though Gatling had been handcuffed and the satchel had been removed from his body and taken into the locked stairwell.

To begin, Officer Mekhael had a "perfectly reasonable apprehension" that Gatling was carrying a firearm in the satchel. *Id.* But because of Gatling's resistance, Officer Mekhael was unable to complete the pat down and needed additional assistance to restrain Gatling. Hearing Tr. at 32:21–25. Once Gatling was in handcuffs, the satchel was pinned between Gatling's back and his left upper arm, leaving Officer Mekhael with no easy way to frisk the satchel without removing it from Gatling's person. Mekhael BWC at 09:13:53–09:13:59; Hearing Tr. at 34:2–12. And once Officer Mekhael had removed the satchel and taken it into the locked stairwell while he briefly searched for any items Gatling might have left behind, Hearing Tr. at 35:17–23; Mekhael BWC at 09:14:25–09:14:45, Officer Mekhael was justified in continuing the pat down.[6] Though separated by a locked door,

---

[6] While not directly raised by the parties, Officer Mekhael's decision to search the interior stairwell did not exceed the scope of the *Terry* protective search. Where police suspect an individual may have discarded criminal evidence prior to a *Terry* stop, the officers may detain that individual while "checking certain premises" and "locating and examining objects abandoned by the suspect." *Michigan v. Summers*, 452 U.S. 692, 700 n.12 (1981) (citation omitted); *see also United States v. Bailey*, 743 F.3d 322, 337 (2d Cir. 2014) ("[P]ersons suspected of discarding criminal evidence are regularly detained pursuant to *Terry* while police search for the discarded item to confirm or dispel their suspicions."). After all, "the concern for officer safety extends not only to a suspect himself but to 'the area surrounding a suspect' where he might 'gain immediate control of weapons.'" *Walker*, 615 F.3d at 732 (citation omitted). Thus, Officer Mekhael was justified in briefly searching the stairwell for any weapons Gatling may have discarded.

Officer Mekhael remained within several feet of Gatling (who was still being detained by officers on the front stoop) when he frisked the satchel, which happened only about 30 seconds after he removed it from Gatling's person. Mekhael BWC at 09:13:59–09:14:28. And once he removed the satchel, what other choice as a practical matter did Officer Mekhael have? Without probable cause to make an arrest, Officer Mekhael would have had to return the bag unsearched and allowed Gatling to "go on his way." *Illinois v. Wardlow*, 528 U.S. 119, 126 (2000). Accordingly, it was reasonable and justified under the circumstances for Officer Mekhael to remove and frisk the satchel.

Our Circuit has never addressed facts identical to those presented here. It has, however, considered analogous facts in the context of a vehicle stop and concluded that the temporary nature of *Terry* stops (and the possibility of the suspect regaining access to a weapon) may justify searches outside a suspect's immediate grab area. In *United States v. Vinton*, 594 F.3d 14 (D.C. Cir. 2010), an officer pulled over a car for speeding and excessively tinted windows and saw a knife in the backseat. The officer removed the driver from the car and placed him in handcuffs as part of a *Terry* stop. He then searched the passenger compartment of the car and, following the defendant's arrest, the rest of the car. *See id.* at 18–19. The search uncovered another knife, a bag of earplugs, and a locked briefcase, which was later revealed to contain drugs and other weapons. *Id.* The driver moved to suppress the evidence found in his car, but our Circuit upheld the search. In particular, the court declined to extend to the *Terry* context the Supreme Court's decision in *Arizona v. Gant*, 556 U.S. 332 (2009) (holding that officers may not search a vehicle's passenger compartment incident to an arrest after the occupant has been secured and cannot

19

access the interior of the vehicle).  Our Circuit reasoned that "it is doubtful that the same rule ought to apply in the *Terry* search context" because "[i]n the no-arrest case, the possibility of access to weapons in the vehicle always exists, since the driver or passenger will be allowed to return to the vehicle when the interrogation is completed." *Vinton*, 594 F.3d at 24 n.3 (quoting *Gant*, 556 U.S. at 352 (Scalia, J., concurring)).  While vehicle stops raise thorny issues not present here, the same principles carry through to the case at bar. With a *Terry* stop, the "possibility of access to weapons . . . always exists"—even when the suspect is in handcuffs and outside arms' reach of his belongings—because a *Terry* stop involves only a temporary separation of the suspect from his belongings.  *Id.*

The Sixth Circuit has likewise declined to extend the *Gant* rule to *Terry* frisks of personal effects.  *See United States v. Walker*, 615 F.3d 728, 732–34 (6th Cir. 2010) (Sutton, J.).  In *Walker*, officers received reports of a bank robber on the loose with a skeleton mask and a semi-automatic pistol.  Officers stopped a suspect who matched the description provided and was carrying a duffel bag.  Upon encountering the suspect, officers separated him from the bag and frisked him.  With the suspect separated from the bag, officers unzipped the bag slightly to uncover a skeleton mask matching the description provided and then arrested the suspect.  The defendant moved to suppress, but the Sixth Circuit held that the search was justified under *Terry* even though the bag was separated from the suspect by a few feet.  The court noted that the officers "by no means had the scene under control or their safety secure" before searching the bag.  *Id.* at 734.  And, critical here, the court emphasized that the search was justified given the alternative: "let the men go and return the un-searched bag" to the suspect.  *Id.*  "Where, as here, the only

20

alternative is to give a suspect access to a potential weapon (in an un-searched bag), a *Terry* search for weapons is justified—and reasonable." *Id.*

I find this reasoning compelling. In the case before me, Officer Mekhael reasonably suspected that the satchel contained a weapon, and this concern was not abated by handcuffing and restraining Gatling because if officers otherwise lacked probable cause to make an arrest, Gatling would have been reunited with the satchel and, thus, "any weapons inside." *Vinton*, 594 F.3d at 20 (quoting *Michigan v. Long*, 463 U.S. 1032, 1052 (1983)); *see also Walker*, 615 F.3d at 734. Thus, Gatling's contention that he was no longer a threat rings hollow. He was being stopped, not arrested, so the threat to "the officer or others nearby" after he was released was still very much real. *Terry*, 392 U.S. at 26. Accordingly, the "tempered act" of removing the satchel from Gatling's body and conducting a "limited" frisk of the satchel to identify any weapons was justified and reasonable. *Id.* at 28.

Gatling responds that Officer Mekhael did not use the "least intrusive" means of frisking the satchel—namely, he should have found a way to pat down the satchel while it was still on Gatling's person or at least in Gatling's immediate vicinity and not several feet away behind a locked door. Def.'s Supp. Br. at 12–13. But "[a] search . . . is not unreasonable merely because officers did not use the 'least intrusive' means." *Walker*, 615 F.3d at 731 (quoting *City of Ontario v. Quon*, 560 U.S. 746, 763 (2010)). Judges have the privilege of reviewing officers' split-second decisions with the benefit of hindsight and "can almost always imagine some alternative means by which the objectives of the government might have been accomplished." *Quon*, 560 U.S. at 763 (citation omitted). In the heat of the moment, Officer Mekhael's choice to remove the satchel from Gatling's

21

person and quickly pat it down while inspecting the stairwell was "an efficient and expedient way" to assess whether Gatling was carrying a weapon without prolonging the struggle. *Id.* at 761. Indeed, it may have been *more* dangerous for Officer Mekhael to have attempted a pat down while the satchel was pinned against Gatling's body.

This may be a different case if Officer Mekhael had taken the satchel far outside Gatling's immediate reach—like into his vehicle or across the street—or waited several minutes before conducting the pat down.[7] But on the facts before me, I cannot say that Officer Mekhael's "swift measures" were anything but reasonably "necessary for the protection of himself and others." *Terry*, 392 U.S. at 30. While Officer Mekhael took the satchel into a locked stairwell before conducting the pat down, he remained within several feet of Gatling the entire time. And Officer Mekhael frisked the satchel a mere 30 seconds after removing it from Gatling's person. *See* Mekhael BWC at 09:13:59–09:14:28. One can quibble over whether Officer Mekhael could have conducted the frisk in a more perfect way, but the Fourth Amendment requires only reasonableness, not perfection! *See Walker*, 615 F.3d at 732 ("The courts' job is to ask what was reasonable under the circumstances, not to poke and prod for lesser-included options that might not occur to even the most reasonable and seasoned officer in the immediacy of a dangerous encounter.").[8]

---

[7] Defense counsel presented such a hypothetical at the evidentiary hearing, suggesting a case where the officer waited 20 minutes to pat down the satchel. *See* Hearing Tr. at 54:22–55:4. Those are not the facts of this case, and, to be sure, the analysis here is highly fact-specific.

[8] Gatling relies heavily on *United States v. Buster*, 26 F.4th 627 (4th Cir. 2022). That case is not binding on this Court, and I also find its reasoning unpersuasive. In *Buster*, officers responded to a report of a domestic assault and encountered an individual who matched witness descriptions. When officers approached, the suspect took off running but quickly fell and was tackled by officers. The suspect was wearing a satchel, and officers cut it from his body after the suspect complained of it choking him. Officers

22

Ultimately, the question is one of reasonableness. *See Heien v. North Carolina*, 574 U.S. 54, 60 (2014) ("As the text indicates and we have repeatedly affirmed, 'the ultimate touchstone of the Fourth Amendment is "reasonableness."'" (quoting *Riley v. California*, 573 U.S. 373, 381 (2014))). Once he removed it from Gatling's back, Officer Mekhael had no other choice as a practical matter but to frisk the satchel. In light of his well-grounded suspicion that the satchel contained a gun, Gatling's resistance to the officers' safety precautions, and the quick succession between the removal of the satchel and the pat down, I find Officer Mekhael's decision to frisk the satchel to be reasonable.

## III. CONCLUSION

For the foregoing reasons, I find that Officer Mekhael had reasonable suspicion to conduct a *Terry* stop, and that the *Terry* stop did not transform into an arrest. I also find that the frisk and resulting search of the bag were reasonable and did not violate the Fourth Amendment. I will therefore **DENY** defendant's motion to suppress. An Order consistent with the above accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge

---

then felt the exterior of the bag, which felt "[h]ard to the touch" and indicative of a "weapon." *Id.* at 630 (alteration in original). Officers searched the bag and found a firearm, but the Fourth Circuit held it should be suppressed. The court reasoned that feeling a weapon within the bag was not enough to "generate reasonable suspicion that Buster was 'presently dangerous'" because there was "no realistic danger to officer safety" if the suspect was handcuffed. *Id.* at 635 (quoting *Terry*, 392 U.S. at 30). In reaching that conclusion, the Fourth Circuit ignored the possibility that the officer would have had to return the satchel (with a firearm likely inside) to the suspect. I find the reasoning of our Circuit's decision in *Vinson*, as well as the Sixth Circuit's decision in *Walker*, to be far more compelling.